Last case this morning is Jazz Pharmaceuticals v. Avadel CNS Pharmaceuticals, 2024-2274, 77 and 78, Mr. Bell. Good morning, Your Honor. May it please the Court. Gabe Bell for the appellant, Avadel. The District Court's injunction in this case goes directly to the heart of the safe harbor protection that Congress provided, precisely for companies like Avadel that are developing, investigating, and ultimately seeking approval for new and unique treatments that can benefit the patients and the public. District Court's injunction even goes so far as to prevent Avadel from seeking FDA approval. That is the absolute core of what Congress wanted to protect and encourage. Especially here, where we have a product that the FDA has deemed clinically superior in a related context, that's as to narcolepsy, and all Avadel is trying to do here is allow FDA to make that same, we believe will be a readily apparent conclusion for FDA in a different context, related context, of IH. The safe harbor provision applies with respect to non-infringing activity. Is that correct? It deems non-infringing categories of activity that are about the regulatory process. So developing and submitting information to a regulatory body such as FDA for the purpose of, for example, getting approval for a new treatment. That's the core of the safe harbor provision. And Congress further provided, and that was at subsection E1, and in E3, Congress went so far as to say no injunction shall issue as to conduct covered by section E1. Congress anticipated that there would be these attempted end runs to try to nonetheless stop the regulatory process in its tracks before it can even get to FDA. Congress, of course, had in mind rectifying the twin aims at the front end of a patent term and at the back end of the patent term. And it did so very deliberately. It recognized that the regulatory process can be involved. It can take some time. So at the front end, the patentee shouldn't be penalized for the regulatory process initially. So you can provide a patent term extension. That's in section 156. The court went through the four factors with respect to an injunction. Does that really matter? If you're presenting data to the FDA, isn't that ipso facto exempted from infringement? Yes, it is, Your Honor. And especially in this context where we're talking about what's the proper scope of the remedy. So the district court had in front of it a request for an injunction. And the safe harbor certainly plays into, according to Congress in subsection E3, what the scope of that injunction can entail. And if it cuts at activity that is even reasonably related to seeking FDA approval or reasonably related to submitting information, that is, as a matter of law, as this court held in Klassen, the 2015 version, as this court held in Edwards, as this court held in Abtox, as a matter of law, that conduct is non-infringing. But here, we're even more straightforward. Well, infringing on non-infringing would seem not to be the issue. If it's non-infringing, the exemption doesn't really matter. The exemption matters if there would otherwise be infringement. And there would here because you've got a composition claim, which would dominate the use for IH purposes. I think there would otherwise be infringement as to the clinical studies at minimum. But then the safe harbor kicks in and says it shall not be infringing to conduct these trials. And I don't think there's any meaningful dispute that the revitalized trial that Avidel is doing is precisely to get FDA approval and a supplemental NDA for an additional indication. And that aligns exactly with Klassen, we submit. Now, this patent's got a long way to go, as I noticed. So either you've got to, if you get that approval, it's got to be held up, or else you've got to prove the patent invalid. So it's a good point, Your Honor. And so I would take this opportunity to note that the comments from the court are presumed to be good. Thank you, Your Honor. And I do so presume. And that leads me to point out the kind of procedural quirk here, where the district court decided to address the injunction before addressing J. Maul's on invalidity, which we expect to raise. I probably would have done it in the reverse order. But I guess I was understanding Judge Lurie's question to ask. Suppose you win here and you get to file, do your studies and get to file your application for the IH indication on your drug, and the FDA says, I approve. What's going to happen then on the assumption that you have lost on the merits in this overall case? I don't mean on this appeal, I mean the overall case, what you were just referring to. Sure, absolutely, Your Honor. At that point, I was told, what, 2036. 36 or thereabouts, that's right. So a couple of things I would foresee happening. If FDA is allowed to do its job, and if, as we believe, it will find it clinically superior, that would be a material change in the circumstances. And we would go back to the district court and say, you should change the injunction to make this align with your ruling in the narcolepsy context. Would the district court recognize that a clinically superior drug that benefits patients shouldn't be enjoined? So then we're in a very different... I'm not sure it quite went that far in the absence of generics. Generics. And there's litigation ongoing. We don't know what the landscape will look like two years from now. Let's assume all of that away. Well, at the end of the day, if... Let's suppose, as I think the other side has suggested, that in fact superiority over your product may well not be decided by the FDA. In fact, it may not be necessary for FDA approval. FDA approval in your comparative study may not be, in fact, doing the comparison. So just assume that the FDA approves the drug and the IH use of their Zywave drug is not yet met with any competition. You're then barred by this injunction in the absence of a Rule 60-type ground for change of circumstances for getting relief from it. In the absence of that or in the absence of a subsequent appeal that would show the patent to be invalid. That's the other thing that's coming down the pipe eventually. And so I suppose if we lose all of those, then yes, the injunction would still stand. That would lead me, though, to our second basis for challenging the injunction was that the eBay factors themselves were improperly weighted in the sense of looking at harm that's speculated. In Monsanto, the Supreme Court said it has to be imminent. And they relied not on anything imminent. They relied on the possibility of marketing, which was at least two years away. And all these things could happen in the meantime. Generics could come on the market. There could be a clinical superiority finding by the FDA. It doesn't make sense, we argued to the district court and argue here, to do that in a vacuum weighing the eBay factors. Now, of course, our primary argument is at the very bare minimum, the scheme that Congress put in place in 1984 requires the regulatory process to at least come up to the point of being approved. And then you deal with the patent stuff, the consequences after that. That's what the HR report said that accompanied the bill. So for the application that you want to submit for the IH indication on, what is it?  Lumerize? Lumerize, correct. Lumerize, right. Correct. Okay. That would not come with a 30-month automatic strike? No. It would not?  So if the injunction is lifted for the application for that approval and you get the approval, will there then be a new application for preliminary injunction by Jazz and you'll have to litigate that under extremely rushed circumstances? I mean, I would assume that. They've shown propensity to do that. I would assume they would do that in this case. The point I'd like to make there is the reason we're not dealing with an automatic stay is we're not dealing with an Orange Book listed patent here. Jazz doesn't practice the patent that they're asserting. They don't have an extended release version. That's what Avidel came up with. That's what Jazz couldn't do. That's why Avidel's product is clinically superior for narcolepsy because you can take an extended release dose that lasts over time and you can take a higher dose. You can go up to 9 grams whereas theirs is limited to 6 grams and immediate release. And, you know, just speaking as somebody who's had medications that are immediate release and extended release, that can make a very meaningful difference in your life. And that was shown to be true in the narcolepsy context and we think it will equally be shown true in the IH context. And all they're asking is to allow FDA to do its job as Congress intended. Can I ask you a question? Why doesn't your stipulation to infringement, which is quite broadly worded, prevent you from relying on E1 here? So the stipulation says pursuant to 271A. That's how it reads. And so our position is we didn't mean to convert per se non-infringing conduct into infringing conduct. 271A itself says except as otherwise provided in this section, comma. Right, but your stipulation was that your activities infringe under 271A. Well, I think in the context of the case... It may have been unfortunately worded, but it didn't make an exception for the exception to 271A. Well, our position is that it's implicitly there. If you cut and paste the 271A language in there, we're stipulating that under this provision, the whole thing, not part of it, we infringe. Meaning still subject, of course, to things like submitting paperwork to the FDA, which I don't think frankly is even a use of a drug to begin with. So if you want to talk about the actual language of 271A, make, use, import, et cetera, simply submitting papers like submitting papers to this court about this patent invention, that's not a use of it. Submitting information in a database isn't use of a drug as this court held in the last iteration of this. Would it also be the case that use is specifically addressed by 271E2 for which very well-defined remedies are specified in the statute and those remedies do not include this kind of injunction? Absolutely. So even, let's presume it was an orange book-listed patent, which is what E2 goes to. It's not in the text necessarily, but the Supreme Court has read it to be related. You're not that. You're a 505E2. We're not that. There's no orange book-listed patent. There's no paragraph 4 certification that would trigger E2 infringement. But let's even assume there was. The court is absolutely right. There are four and only four remedies that you can get even for that artificial act of infringement, and not one of those is in joining the submission to FDA. You could delay FDA approval, right, if there's an orange book. That's not what we're dealing with here. But the others all relate to damages and non-injunctive relief. And in C3, the Congress couldn't have been more clear. No injunctive relief shall issue for safe harbor activities. We think that's the start and the end of this case, and with that, I'll reserve my rebuttal time. We will save it for you. Thank you. Mr. Calvoso. Good morning, and may it please the Court. Frank Calvoso from Quinn Emanuel, Orecard, and Sullivan on behalf of Jazz Farm Recidivals. The district court used its discretion to carefully craft a limited injunction in this case. The patent that's at issue has already been tried. Avidil is stipulated to infringement. Avidil failed to succeed on its invalidity defenses. With respect to the... So far. So far, I agree, and I believe it will continue in the future. With respect to the injunction, Avidil already has its infringing products commercially available on the market, which makes this unlike other cases where the safe harbor is at issue. And under the injunction, Avidil is permitted to continue and expand upon its infringement in the narcolepsy market, where Avidil does not dispute that it claims it will make billions of dollars. What the injunction does is it very limitedly says Avidil can't expand that infringement even further. And it focuses on the IH market, where Jazz already has an FDA-approved, safe and effective once-nightly drug for the treatment of IH. That was a distinguishing factor in narcolepsy. Jazz only had twice nightly. The district court found, based on clinical research and competing expert declarations, that there was factual evidence, I mean factual findings, that Jazz's once-nightly dosage is not substantially different than its twice-nightly dosage in IH. Can I just ask? Yes, Your Honor. On the irreparable harm part of the district court's analysis with respect to the IH use, my recollection is that the district court said that if IH is marketed, then there's going to be irreparable harm to Jazz. But it didn't ever make a finding that the specifically enjoined activities here that are at issue on appeal, namely asking for approval from the FDA, conducting clinical studies to get that approval, and allowing the patients in the 150-person study to continue the extra 18 or 20 weeks or something for the open-label extension, that those would cause irreparable harm to your client. Is there a crucial missing element? A couple things, Your Honor. First of all, Avidel did not raise the safe harbor argument below. It did not raise the open-label extension argument below until the state briefing before the district court. Avidel had full view of the injunction that Jazz was seeking and raised none of these arguments during injunction briefing. And then they seek to fault the district court for not addressing it. I want to circle back to the OEL at the end because the district court did speak to that in denying Avidel's stay request. But the evidence was before the district court that harm is already taking place. Avidel is on the market, approved for narcolepsy, but the product is also being used already for IH. They have infringing sales in IH. And another portion of the injunction is that Avidel cannot make, use, or sell or market in any condition other than narcolepsy, and that includes IH. If it's being used, it's on the market for narcolepsy now. If it's being used for IH, that's sort of off-label. But if they're seeking approval by the FDA for IH, that's exempted from infringement by statute. And that's another point that I think I lost in what I'm saying. In the modified injunction, the clarified injunction, in the clarified injunction, and this is at Appendix 41, the district court says, Avidel, you can do your revitalized trial. Avidel, you can submit that information and results to the FDA. What is enjoined, and this is very important, is not the submission of an application to the FDA. It's seeking approval until the patent expires. The safe harbor does not protect FDA approval as of any certain date. It doesn't mean Avidel has to get approval now. Avidel is free to submit their application, but with that, they would have to tell the FDA, we are not seeking approval until February 18, 2036. That's what the injunction says. Avidel is free to submit their application. They're free to submit information in support of clinical superiority. We don't think they're going to get it. We already have a one-sided claim. The injunction says they're not free to submit it. This is at Appendix 41, Your Honor. It says, finally, while the order enjoins Avidel from seeking FDA approval for rights, the order does not enjoin Avidel from submitting information or results from ongoing clinical studies to the FDA. And Avidel is permitted to continue the revitalized trial. And the injunction at Appendix 36 specifically says that Jazz's motion for a limited permanent injunction prohibiting Avidel from seeking approval from the U.S. Food and Drug Administration and marketing and lumerize is granted, but it's only through the expiration of the 782 patent. So Avidel is allowed to submit that application. They can't seek approval until February of 2036. They're enjoined from doing so. This is no different than any other application that somebody submits to the FDA. Well, they can seek approval, but they can't act on it. Well, no, when you... If they acted on it by marketing, they're at risk. But they're enjoined under the current injunction for marketing, and that gets lost in the argument as well. The current injunction enjoins make-use seller marketing in addition to the seeking FDA approval until a certain date. And when an applicant goes to the FDA, they say, I'm seeking approval as of before expiration of patents, as of expiration of patents at this date. The applicant can specify in their submission which date they're doing it. Let me just see if I understand this. So not challenged here is the part of the injunction that prohibits Avidel from marketing for IH use. Avidel challenges that only on the public interest factor. That's the only challenge they make to the eBay for the make-user sellers. I understand it. So when my friend said that if they were to get approval... Put that aside.  Assuming that that is not an issue, then the only things that are the issue are activities leading to FDA approval or a request for FDA approval, right? Somewhat, yes. If they get FDA approval, assuming the injunction, I'm going to assume it bars sale and marketing, they can't actually jump into the market. Well, here's the issue, and this is what the district court foresaw, is that because they are already on the market and the product is out there, what happens is with FDA approval, and Avidel doesn't dispute this, FDA posts a labeling on the website. Pursuant to FDA regulations, Avidel must then use that labeling with the IH indication out there when it disseminates its product. This court has been clear. On indication, use in a label is infringement. It's certainly marketing that's barred under the injunction. Here, because this isn't an Orange Book patent, the district court cannot enjoin the FDA from approving the drug. The district court cannot enjoin the FDA from posting that label on the website or requiring Avidel to use it. What the district court could and did do was enjoin Avidel from asking for FDA approval until a certain date, which is what applicants can and do all the time. Let me see if I understand. If the FDA were to approve, the district court would have to face the question whether its injunction precludes Avidel when selling this product from using a label that the Food and Drug Act would require it to use? No, the district court's injunction already precludes an infringing use and it would be on the label at that point in time. The way this works in other cases... I don't think I'm communicating because I didn't hear that as an answer to my question. I'm trying to get very concrete about what is the problem with allowing the FDA approval process to go forward now? The problem with that is that we'll be right back in front of the district court if Avidel were to get approval because then they have to have that new labeling out there and the district court's injunction bars make you sell marketing. I guess I'm taking as a premise for purposes of this question that offering the product with a label that identifies IH use would in fact be marketing contrary to the current injunction. Exactly, and then Jazz would be right back in front of the district court for a contempt proceeding because Avidel would be marketing. And the district court foresaw this and the district court made factual findings that entering the market for IH would irreparably harm Jazz's exclusivity there. And Avidel had already had off-label sales and Avidel's excuse was we don't promote it. And that is at Appendix 9069. And they also say that in their briefing before the district court at Appendix 7510 because we don't have the labeling we don't promote. But with FDA approval comes that labeling. I know that this court's case law for entry, GSK v. Teva, if you have an on-use indication label that's inducing infringement. So the district court said you could submit your information, Avidel, and we don't dispute that. They could file their application. They could submit information. They could go back and forth with the FDA. What they need to tell the FDA and what the district court's injunction says is we can't, you can't seek approval until a certain date. So you file your application, you say we're enjoined from getting approval until February 2036. We have to grant approval even if Avidel simply refrains from asking it to grant the approval. Because you're now saying you could file its application. Yes. Avidel could do that. Our position is that the FDA would not grant approval in that case. Or just wouldn't. That's what applicants do all the time. If they file an application, they could say I'd like approval before a patent expires. I'd like approval when a patent expires. This is not an injunction on seeking FDA approval in vacuum, full stop, as Avidel tries to make it seem. It's tied to a specific date because they've already been adjudicated infringers of that patent. So there's the approval request issue, there's the OLE issue, and there's the doing more clinical studies. For the OLE and the doing more clinical studies, there is no record evidence below that that activity falls within the safe harbor. You have to look under this court's case on the Supreme Court. Doing clinical tests necessarily, they don't do it for academic reasons. They want to get approval to sell the product. Well, the district court made a factual finding at Appendix 43 that these OLE trials are marketing activities dressed up as research. It quoted from a paper that Jazz put in during the state briefing. And if it's solely for... At least in my mind, I think of there being two questions. One is new clinical trials. The second is the OLE extensions. Can you put aside the OLE extensions, John? Yes, Your Honor, I can. If you have just new clinical trials, how could it possibly be that a new clinical trial would not be within the E-1 extension? Because under both Supreme Court case law and this court's case law, you have to look at each and every use. And it is a factual question. We saw in Amgen, BITC, and even Hasbara, sorry. What if the injunction were modified to say the injunction does not preclude clinical trials covered by E-1, but we actually have one that we already know enough about, so we're going to get concrete about the only current one on the table and say that that's in or out. But there's a general, there would be a general carve-out for E-1 covered. I think what the proper remedy here would be is that if Avidal has, under this court's case law, reasonable reason, necessary clinical trial each and every use, they would have to prove Rule 60B provides for a modification. And advocates could go back to the district court. They could even come to Jazz beforehand and say, hey, the FDA told us we need to do this study. And the parties could deal with it then. You say they're doing these new clinical trials for marketing purposes. But don't those data still have to be presented to the FDA? No, Your Honor, they don't. And, for example, the OLE in the Stern Declaration, that's ECF 23, Exhibit 2, to 60, for example, says the OLE is completely voluntary. It's not a requirement that the FDA put in place for that protocol. And even at page 9 of that exhibit to the Stern Declaration, that's Exhibit 2 to the Stern Declaration, which was ECF 23, it explains that the only efficacy information and patient population for the study is coming from the revitalized trial, not the open-label extension. And in this case, where Avidal is already on the market, unlike other cases... Isn't there... I don't remember whether it's an assertion by Avidal's lawyers or something in the evidence that the use for the extra number of weeks when the patient that had been in the trial after the endpoint and now has its open label so the patient knows I'm getting the good stuff and not the placebo or something, accuses it that that actually would be safety-related information. If you take that, then every... They made that argument the district court didn't credit it. And furthermore... Was there evidentiary support for that argument? This was an argument that they made that it includes safety information. Every use of the drug would be safety information then. And under FDA requirements, once you get approval, you're required to put in adverse events and safety information. This is routine use, which under MOMENTA 2, the 2015 decision, isn't covered by Safe Harbor. The parties didn't get to litigate that because Avidal didn't erase it. And to the extent the district court did address it, it rejected the OLA under Appendix 43. I see I'm out of time. I'm happy to answer any other questions, but we believe the district court's decision should be affirmed. Thank you, counsel. Thank you, Your Honor. I think what's clear now is what we're really talking about here is a de facto patent term extension. They want to muck up the regulatory process that Congress allowed for in the Safe Harbor and start to parse it out and say you can do this part or you can do that part, but you can't do all of the things that are reasonably related. So you can submit an application, but you can't ask for FDA approval. I'm not sure I totally understand that. What Congress said was that that includes submitting for and asking for FDA approval. I think that is squarely within the Safe Harbor. Clinical trials leading up to it. As Your Honor noted, we don't do them... I'm sorry to interrupt. Why is asking for FDA approval within the language of E-1? It's within the language of E-1, which provides for... Asking for it, I'm going to assume that that is not actually infringing under 271A, but that's not the point you're making. Oh, if we assume it's not even infringing under 271A, then you don't need the Safe Harbor for it. I think that would be kind of the first line. It's not actually... Tell me about E-1. Sure. So E-1 says use is reasonably related to the development and submission of information under a federal law. And the whole point of this was that we can deem those regulatory activities for seeking approval as kind of de facto marketing. That's the position Jazz wants to take now. And Congress resoundingly said, no, we're going to let the regulatory process play out. And so for in Claussen, for example, this court in 2015, very similar facts. There was an already approved drug. The party realized that there was a different interaction with food. It did voluntary, a supplemental NDA, SNDA, clinical studies, a supplemental NDA, seeking FDA approval. This court said that was, quote, clearly, all of that was, quote, clearly within the Safe Harbor and ruled as a matter of law on summary judgment. What's your response to the other side's argument that you waived your Safe Harbor argument? Yeah, so a couple of things, Your Honor. I see I'm getting close on time. This is really about the scope of the injunctive relief. So we have the liability phase, which led up to the injunctive proceedings, and the scope of the injunction that's at issue. And squarely raised at least a half a dozen times at the hearing was the statutory Safe Harbor. And in fact, at one point, the district court, and this is at A. But just to be clear, not in your actual papers. Correct. It was not in the brief. We presumed at a couple points that we would be allowed to, but didn't come out and say Safe Harbor. But it was teed up squarely at the hearing, and the district court said, quote, right, that's protected by statute. And when the other side was pressed on it, they didn't say there was any sort of waiver, either during the hearing. In fact, after the hearing, in response to our letter, they said, we never contended that you couldn't do trials. And thereafter, the district court didn't find a waiver in considering the issues on the stay motion where they raised waiver. This court didn't find it in granting a partial stay. We think the Safe Harbor was clearly raised, and we've cited in our brief six different places at the hearing. Can I just come back to something? Yes, of course, Your Honor. So, on the assumption that the part of the injunction not having to do with the FDA, that just, you cannot market, let's call it that. Right. If you go ahead and you get FDA approval, at that point, you're actually barred from marketing, from acting on the FDA approval to market. I think the other side said that at that, once there's FDA approval, your label has to include the indication, which I'm going to assume for purposes of this question, is marketing. What's supposed to happen? I think, according to my friend, we'd end up back in front of district court, and we would sort it out there. What's the appropriate path going forward? And so that's appropriate because Congress has kind of said what happens up until then. Congress says you have to allow this process to play out, and not just for the benefit of the party seeking it. It's for the benefit of the patients, and it's for the benefit of the public as well. Would the district court have the authority at that point? Suppose the district court concludes it really would be irreparable harm, the FDA hasn't said that your product is superior in a meaningful way, and so in ordinary eBay injunction terms, an injunction is warranted. Would the district court be able to authorize to keep that injunction in place notwithstanding the FDA approval? I think we would have to litigate it. I think we absolutely would have to litigate it. And I think an important point here is my friend said there would be induced infringement putting it on the label. Notably here, they asserted induced infringement initially, but that's not what the stipulation addresses. Stipulation addresses direct infringement. So we're in a world where the direct infringement is enjoined for marketing, not induced infringement. Did the court account for all this by limiting the injunction? They did not limit it enough, Your Honor.  specifically says, and this is appendix page 36. But enough to recognize your arguments or the position that you're taking now. Well, I think it at the hearing seemed to recognize our arguments and saying that's protected by statute. But then ultimately in the actual injunction prohibited seeking FDA approval, which simply is irreconcilable with the scheme that Congress put out, particularly in section E3 which says no injunction shall issue on safe harbor conduct. And we think that disposes of this case for the benefit of the patients and the public. Avidel should be able to seek FDA approval for IH. For other indications that may come, sleep disorders are a terrible thing for the people suffering from it. And those patients shouldn't have to suffer. Avidel has a superior product in narcolepsy and we think the same will be true in IH. For that reason, the injunction should be rejected. We've heard your argument. There's no narcolepsy here. Thank you, Your Honor. The case is submitted and that concludes today's argument.